United States District Court
Southern District of Texas

**ENTERED**

April 28, 2016

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLYCOBIOSCIENCES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-02109 |
| | § | |
| WOODFIELD PHARMACEUTICAL, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## OPINION & ORDER

Pending before the Court in the above-referenced case is Plaintiff's Corrected Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction.[1] Doc. 22.

On March 31, 2016 this motion was referred in error to Magistrate Judge Frances H. Stacy (Doc. 66). The Court hereby strikes that referral.

The Court heard oral argument on the motion on December 15, 2015. Doc. 26. After considering the motion, response, oral arguments, and applicable law, this Court finds that (i) the motion to compel and for seizure order should be granted, (ii) the motion for a preliminary injunction should be granted, and (iii) the motion for a temporary restraining order should be denied as moot.

## I. BACKGROUND

Plaintiff Glycobiosciences, Inc. ("Glyco") is the developer of numerous pain-relief products used in the treatment of damaged skin, wounds, ulcers, sores, and pain management, as

---

[1] Plaintiff's Original Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction, Doc. 15, is superseded by the pending motion and is, therefore, denied as moot.

well as several other diseases and conditions. Doc. 22-1 at 5. These products utilize Glyco's proprietary and patented Ionic Polymer Matrix ("IPM") delivery system, which is made using hyaluronic acid ("HA"). *Id.* Glyco's HA delivery system is classified as a medical device by the United States Food and Drug Administration ("FDA") and the company holds patents protecting this technology. *Id.* The company also has a proprietary method for manufacturing its products. *Id.* Because Glyco is not engaged in manufacturing itself, however, it actively contracts with various manufacturers and distributors in order to produce and market its products. *Id.* at 6. In order to prevent unprotected dissemination of its trade-secret materials by such partners, Glyco requires that all such entities be bound by certain confidentiality and non-disclosure agreements. *Id.*

In February 2011, Glyco entered into a confidentiality agreement with two such entities, Great Southern Labs ("GSL") and ECR Pharmaceuticals Company. Doc. 22 at 4. In December 2011, Glyco and GSL also entered into a mutual nondisclosure agreement. *Id.* Seven months later, Pernix Manufacturing, LLC ("Pernix") acquired all of the assets of GSL—including the contractual rights embodied in the confidentiality and nondisclosure agreements between Glyco and GSL. *Id.* Sometime between 2012 and 2013, Pernix also acquired another entity known as Cypress Pharmaceuticals ("Cypress"). *Id.* On May 7, 2013, Glyco and the recently enlarged Pernix entered into a new nondisclosure agreement. Doc. 22-1 at 6. Within twelve months, however, Pernix was acquired by Defendant, Woodfield Pharmaceuticals, LLC ("Woodfield"). *Id.*

After this acquisition, Plaintiff and Defendant entered into the Manufacturing and Supply Agreement ("MSA") at the crux of this dispute. *Id.* Dated April 23, 2014, the MSA states that Woodfield is in possession of Glyco's proprietary HA formulation by virtue of its acquisition of

Pernix. *Id.* The terms of the MSA further acknowledge Glyco's ownership of the information, state that Woodfield received the information under strict terms of non-disclosure and limited use, obligate Woodfield to return the materials to Glyco in the event the MSA's termination, and authorize injunctive relief for breach of the terms of the MSA. *Id.* at 5–6. Although Woodfield never actually manufactured anything for Glyco pursuant to the MSA, Doc. 28 at 3, the parties dispute whether Woodfield has used the proprietary information it gained through the MSA and other agreements to manufacture products similar to Glyco's product. *Compare* Doc. 22 at 7–9, *with* Doc. 28 at 3–4.

In a separate business transaction, on September 19, 2014, Plaintiff and Defendant's affiliate, Woodfield Distribution,[2] entered into a Third-Party Logistics ("3PL") Services Agreement to provide certain services to Glyco, including "inventory management, warehouse, storage, fulfillment, order processing, quarantine functions, distribution, handling and shipment of non-scheduled pharmaceutical products." Doc. 23-1 at ¶ 8. Pursuant to this agreement, Woodfield Distribution purchased and received two batches of Glyco's product from the company's then-manufacturer, Bioglan. *Id.* at ¶ 28. According to Woodfield Distribution, Glyco subsequently failed and refused to pay a number of invoices associated with the purchase and storage of this product. *Id.* at ¶¶ 30–53. As that contract dispute between Plaintiff, Defendant's affiliate, and two other companies unfolded, relations between Plaintiff and Defendant deteriorated.[3] Doc. 28 at 1–4; *see also* Doc. 28, Exs. H-L. By June 3, 2015 all agreements between Plaintiff and Defendant had been terminated. Doc. 22 at 8. Under the terms of the MSA

---

[2] Woodfield Distribution, LLC is a third-party logistics company affiliated with Defendant. Doc. 28 at 2; Doc. 19-2 at ¶¶ 6–9. Both Woodfield entities share the same President, Adam Runsdorf. Doc. 19-2 at ¶¶ 3, 5.

[3] That dispute is now being litigated in federal court in New Jersey. *Novotec Pharma, LLC, v. Glycobiosciences, Inc.*, No. 3:15-cv-01315-AET-DEA (D.N.J. Feb. 20, 2015).

and the other confidentiality and nondisclosure agreements that Plaintiff and Defendant's predecessors were party to (wherein the confidentiality clauses were stated to survive the expiration or termination of the agreements), Glyco subsequently requested the return of its confidential information. *Id.* When Woodfield declined to return or confirm destruction of Glyco's confidential information under the terms of those agreements, this litigation ensued. *Id.*

In July, Glyco filed suit against Woodfield seeking specific performance, damages, and injunctive relief for breach of contract and tortious interference. Doc. 1 at 1; ¶ 27–69. In October, Glyco filed its first Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction. Doc. 15. Defendant responded in opposition. Doc. 19. That motion was superseded and mooted by the filing of the current Corrected Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction. Doc. 22. Defendant also opposes the current motion. Doc. 28.

On November 6, 2015, Defendant's affiliate, Woodfield Distribution, assigned its claims against Plaintiff to Defendant. Doc. 32-8. At the oral hearing on the pending motion, the Court granted Plaintiff's Motion for Leave to Amend Pleadings and Add New Parties, Doc. 30, as well as Defendant's Motion for Leave to File Amended Answer and Counterclaim, Doc. 23. Accordingly, Defendant now has pending counterclaims against Plaintiff for breach of contract, unjust enrichment, quantum meruit, and expenses of litigation and attorneys' fees based on the 3PL Services Agreement between Glyco and Woodfield Distribution. Doc. 23-1 at ¶¶ 4–8, 56–73.

## II.  LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a

substantial likelihood that the party will prevail on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the nonmovants; and (4) granting the preliminary injunction will not disserve the public interest. *A.T.N. Indus., Inc. v. Gross*, No. 15-20102, 2015 WL 8105841, at *3 (5th Cir. Dec. 7, 2015); *Karaha Bodas Co. v. Negara,* 335 F.3d 357, 363 (5th Cir. 2003). Although an injunction is an equitable remedy, *see, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) ("It goes without saying that an injunction is an equitable remedy."), this circuit has repeatedly cautioned that a preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all four elements. *Lake Charles Diesel, Inc. v. General Motors Corp.,* 328 F.3d 192, 195–96 (5th Cir. 2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co.,* 760 F.2d 618, 621 (5th Cir. 1985)) (internal quotation marks omitted). Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting *University of Texas v. Comenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). The decision whether to grant a preliminary injunction thus lies within the sound discretion of the district court. *Weinberger,* 456 U.S. at 320; *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).

### III. ANALYSIS

### A.  Motion to Strike

As an initial matter, the Court addresses Defendant's request that the Court strike Plaintiff's Exhibit 4, Doc. 22-5, from the record and decline to consider it. Defendant argues that the exhibit is inappropriate for consideration for two reasons: (1) it is not authenticated, and (2)

is hearsay.[4] Doc. 28 at 4. Regardless of whether the Court were to find the document admissible, it would not change the Court's holding. As such, the Court declines to address Defendant's objections. *See, e.g.*, *Hanold v. Raytheon Co.*, 662 F. Supp. 2d 793, 801 (S.D. Tex. 2009) (finding it unnecessary to address evidentiary objections when, even if admissible, consideration of the evidence would not change the Court's holding).

## B.  Texas Choice-of-Law Analysis

Neither party directs the Court to a choice-of-law provision within the contracts cited, nor could the Court find one within the contract excerpts provided in the parties' exhibits. Because both parties cite Texas cases in their discussion of trade-secret misappropriation, however, the Court will also apply Texas law. *See Garwood v. Int'l Paper Co.*, 666 F.2d 217, 221 n.6 (Former 5th Cir. Unit B 1982) (stating that when parties fail to direct the Court to applicable choice of law in diversity case, the court will assume that the substantive law the parties argued in briefing is the applicable law) (collecting cases).

Moreover, the Court notes that the decision to apply Texas law would likewise be supported even if the parties failed to address choice of law within their agreements. In diversity cases, district courts apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Int'l Interests, L.P. v. Hardy,* 448 F.3d 303, 306 (5th Cir. 2006) (citing *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir. 2004)). Texas determines the enforceability of choice-of-law provisions under the Restatement (Second) of Conflict of Laws ("Restatement"). *Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 432 (S.D. Tex. 2008). Section 188 of the Restatement governs when there is an absence of

---

[4] Because a material's classification as hearsay is not dispositive to admissibility, *see* Fed. R. Evid. 803, presumably Defendant is also arguing that the material is not subject to an exception to the rule against hearsay.

effective choice by the parties and states:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Restatement (Second) of Conflict of Laws § 188 (1971). Because the record shows that Texas has a substantial relationship with the parties and the transaction and no other state has a materially greater interest in the enforceability of the agreements, the parties' contractual choice of law is enforceable under the Texas choice-of-law rules. *See Rimkus*, 255 F.R.D. at 433.

## C.  Motion to Compel Documents and for Seizure Order

Citing § 134A.003(c) of the Texas Uniform Trade Secrets Act,[5] §§ 134A.001–134A.008, Plaintiff argues that "[s]ince the [C]ourt is within its power to require affirmative acts to protect a trade secret, given the severity of the situation and Woodfield's continued access and use of Glyco's trade secret, Glyco submits that a court ordered seizure is warranted and would be most appropriate." Doc. 22-1 at 8, 14. After making this request, Plaintiff does not go on to list what specific materials it seeks to have returned. *See id.* Nor does Plaintiff direct the Court to any precedent for this request. *See id.* In its response, Defendant does not address this portion of

---

[5] "In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Tex. Civ. Prac. & Rem. Code § 134A.003.

Plaintiff's request—skipping ahead instead to argue against injunctive relief. *See* Doc. 28 at 4.

Although Plaintiff's request is less than a model of clarity, earlier in its briefing it does define "the confidential and/or trade secret information" at issue as:

1. All information relating to Glyco's IPM Wound Gel/IPM Wound Gel Bio or Hylase (former name of product) manufacturing file including any formulations and manufacturing procedures.

2. All of Glyco's IPM Wound Gel, IPM Wound Gel Bio or Hylase manufacturing information that was received from Glyco, ECR Hi Tech, or from Pernix in Woodfield's purchase of that company, and all business related assets.

3. All of Glyco's information relating to Glyco's Hylase (IPM Wound Gel Bio) regulatory file, including all data that GSL performed on Hylase (IPM Wound Gel Bio) including all stability data.

4. All of the information that Glyco sent to Woodfield (GSL or Pernix) as to the Hylase (IPM Wound Gel or IPM Wound Gel Bio) ingredient specifications.

5. All notes that Woodfield (GSL or Pernix) developed using Glyco's manufacturing or regulatory files.

6. Any documents relating to any FDA applications for product clearance or approval where Glyco data or proprietary manufacturing or regulatory files were used.

7. If any, all documents relating to the testing of any finished product or raw materials received from Glyco, on any fully validated testing methods, or methods developed but not validated, that was derived from either documents received from Glyco, or documents improperly retained by Woodfield (GSL or Pernix).

8. Any document received from any third party that includes any information that is derived from Glyco's manufacturing or regulatory file, or was received improperly by Woodfield.

9. Information on any third party that was improperly given any of Glyco's proprietary information by Woodfield.

Doc. 22 at 2–3. After considering this nine-point definition, the Court finds that several additional clauses in the MSA are relevant to Plaintiff's request. First, there is a clause within the parties' agreement that specifically addresses return of materials:

6.4 **Return of Materials.** Following termination of this Agreement, each Party, at the request of the other Party, shall return or destroy all Confidential Information disclosed to it hereunder, in whatever form contained, including any listing which identifies the documents which were provided, except that one copy of the Confidential Information may be retained by such Party for the sole purpose of, and only to the extent necessary to, comply with FDA inspections for five years.

The term Confidential Information as used in this clause is defined earlier in the MSA:

1.10 "**Confidential Information**" means with respect to a Party (as the "Disclosing Party"), all non-public information of any kind whatsoever (including without limitation, data, materials, compilations, formulae, models, patent disclosures, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies, techniques and all non-public Intellectual Property and Know-How), and all tangible and intangible embodiments thereof in any kind whatsoever (including without limitation, materials, samples, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which are disclosed by the Disclosing Party to the other Party (as the "Receiving Party") including any and all material containing, derived from or otherwise based upon such information, such as notes, analyses, compilations, documents or records prepared by the Receiving Party any and all copies, replication or embodiments of such information or of such material. Notwithstanding the foregoing, Confidential Information of a Disclosing party shall not include information which the Receiving Party can establish to have (a) been publicly known prior to disclosure of such information by the Disclosing Party to the Receiving Party, (b) become publicly known, without fault on the part of the Receiving Party, (c) been received by the Receiving Party free of an obligation of confidentiality from a source rightfully having possession of and the right to disclose such information free of an obligation of confidentiality, (d) been otherwise known by the Receiving Party free of an obligation of confidentiality prior to disclosure of such information by the Disclosing Party to the Receiving Party, or (e) been independently developed by employees or agents of the Receiving Party who have not had access to the Confidential Information and without the use of Confidential Information of the Disclosing Party. Except as provided in section 11.10, the terms, conditions and provisions of this Agreement shall be considered the Confidential Information of both Parties.

Intellectual Property is likewise defined:

1.15 "**Intellectual Property**" means without limitation all of the following: (i) all Patents; (ii) all Know-How, work product, trade secrets, inventions (whether patentable or otherwise), data, information, processes,

> techniques, procedures, compositions, devices, methods, formulas, protocols and information, whether patentable or not; (iii) works of authorship, copyrightable works, copyrights and applications, registrations and renewals; (iv) logos, trademarks, service marks, and all applications and registrations relating thereto; (v) other proprietary rights; (vi) any regulatory exclusivities, patent extensions, supplemental protection certificates or the like; and (vii) all copies and tangible embodiments of each and all of the foregoing. For purposes of clarity, data, information and methods related to the Product and its components developed in connection with this Agreement shall be considered Intellectual Property regardless of whether or not patentable, confidential, or otherwise subject to intellectual property protection laws.

After examination of these terms, the Court finds that Plaintiff's nine-point definition of "the confidential and/or trade secret information" within its brief encompasses, but is less robust than, the express terms of the MSA. Consequently, the Court will grant Plaintiff's request to the extent it complies with the brief's nine-point definition. In other words, Plaintiff may recover its trade-secret information as defined in its brief. However, in light of the pending counterclaims, the allegedly unpaid-for batches of product sitting in storage with Defendant's affiliate are not included in the Court's seizure order.

### D. Temporary Restraining Order

Plaintiff also requests a temporary restraining order pursuant to Fed. R. Civ. P. 65(b). Doc. 22 at 1. A temporary restraining order, like an injunction, is an equitable remedy designed to preserve the status quo prior to the court's consideration of a case on its merits. *Roark v. Individuals of Fed. Bureau of Prisons*, No. 5:12-CV-60, 2013 WL 2153944, at *4 (E.D. Tex. May 16, 2013), *aff'd sub nom. Roark v. Individuals of Fed. Bureau of Prisons*, 558 Fed. Appx. 471 (5th Cir. 2014) (citing *Dixon*, 835 F.2d at 558; *Shanks v. City of Dallas*, 752 F.2d 1092, 1096 (5th Cir. 1985)). Under the Federal Rules, if not renewed, a temporary restraining order expires after 14 days. Fed. R. Civ. P. 65(b)(2). In contrast, a preliminary injunction may be of indefinite duration. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 435 (1974)

(noting that federal court injunctions are of unlimited duration); *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 n.5 (5th Cir. 1990) ("Because the challenged order is of indefinite duration, it is a preliminary injunction rather than a temporary restraining order."). For reasons discussed further below, the Court has decided to grant Plaintiff's request for a preliminary injunction. Accordingly, Plaintiff's request for a temporary restraining order is denied as moot. *See Dixon*, 835 F.2d at 559 (holding that once a preliminary injunction has taken effect the question of granting or extending a TRO is moot).

### E.  Preliminary Injunction

Defendant argues that Plaintiff has failed to establish any of the elements necessary for a grant of injunctive relief. Doc. 28 at 5. Because Plaintiff carries the burden to establish all four elements in order to obtain the requested injunction, *see e.g.*, *Karaha*, 335 F.3d at 364, the Court will address each element in turn.

#### a.  Likelihood of Success on the Merits: Misappropriation of Trade Secrets

Under Texas law, "[t]he improper use of trade secrets provides a proper basis for an injunction." *Mobius Med. Sys., LP v. Sun Nuclear Corp.*, No. 4:13-CV-3182, 2013 WL 6498981, at *11 (S.D. Tex. Dec. 10, 2013), *appeal dismissed*, (Nov. 25, 2014) (citing *S.W. Research Inst. v. Keraplast Tech., Ltd.*, 103 S.W. 478, 482 (Tex. App.—San Antonio 2003, no pet.); *see also* Tex. Civ. Prac. Rem. Code § 134A.003 ("Actual or threatened misappropriation may be enjoined."). To state a claim for trade secret misappropriation under Texas law, a plaintiff must show: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from the plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2725 (2014) (internal citation and quotation marks

omitted).

### i. Existence of Trade Secret

At the preliminary injunction stage, the trial court does not determine whether or not a trade secret actually exists, but only whether "the applicant has established that the information is entitled to trade secret protection until a trial on the merits." *Mobius*, 2013 WL 6498981, at *11 (quoting *Fox v. Tropical Warehouses, Inc.,* 121 S.W.3d 853, 858 (Tex. App.—Fort Worth 2004, no pet.). A trade secret may consist of any formula, pattern, device, or compilation of information used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 562 (S.D. Tex. 2011), *aff'd sub nom. Wellogix*, 716 F.3d 867 (citing *Hyde Corp. v. Huffines,* 314 S.W.2d 763, 776 (1958)). Courts weigh six fact-intensive factors in determining whether a trade secret exists: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* (citing *In re Bass,* 113 S.W.3d 735, 739 (Tex.2003)). The party claiming a trade secret need not satisfy all six factors "because trade secrets do not fit neatly into each factor every time." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004). As a result, "[d]etermining whether any given piece of information is entitled to trade secret protection . . . is a contextual inquiry which must evaluate a number of factors." *Id.*

Here, Glyco has demonstrated that its proprietary formulation of the IPM Wound Gel using HA; the IPM delivery system; and its proprietary technical information relating to IPM

Wound Gel, IPM Wound Gel Bio, and Hylase are protected formulations and methods developed by Glyco, which are kept confidential and only revealed pursuant to confidentiality agreements. It appears from the record that for years Glyco has meticulously sought to protect this information: by obtaining patents and FDA registrations and requiring each new entity it does business with to sign nondisclosure or confidentiality agreements. This tends to indicate that the information is not well known to those outside of Glyco's circle of confidence and has great value to Glyco. Although the record is sparse with regard to the last two elements, the Court is sufficiently satisfied that the balance of the six factors weigh in Glyco's favor that a trade secret exists.

### ii.  Confidential Relationship

The existence of an agreement that either imposes confidential duties on the parties or provides one party with the opportunity to learn about the other party's trade secret firsthand can establish that a confidential relationship existed between those parties. *Wellogix*, 823 F. Supp. 2d at 565 (citing *IAC, Ltd. v. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 199 (Tex. App.— Fort Worth 2005, no pet.)); *Mobius*, 2013 WL 6498981, at *14. In this case, the MSA and other agreements that Woodfield succeeded to provide clear prima facie evidence that the parties were in a confidential relationship which imposed a duty upon Woodfield not to use Glyco's trade secrets.

### iii.  Use of Trade Secret

Defendant alleges that the National Drug Code ("NDC") Directory codes Glyco cites as evidence that Woodfield is using Glyco's proprietary materials to market a similar product do not exist. Doc. 28 at 6. According to Plaintiff, however, the fact that these NDC codes do not appear in the NDC Directory is not dispositive to Defendant's claim that it is not marketing a

similar product. In support, Plaintiff provides the declaration of Plaintiff's FDA Attorney, Felicia Nowels, stating that the NDC Directory "contains ONLY information on final marketed drugs submitted to FDA in SPL electronic listing files by labelers." Doc. 22-7 at 3. Plaintiff also provides printed materials indicating that products with similar properties to Plaintiff's HA product are registered to Defendant's predecessors-in-interest. Doc. 22-4.

Importantly, Glyco is not required to prove that Woodfield is actually using the information; it need only prove that it is in possession of the information and is in a position to use it. *Fox*, 121 S.W.3d at 860. Accordingly, the Court concludes that Glyco has supported the third element of its misappropriation of trade secrets claim by (1) demonstrating that Woodfield possesses Glyco's trade-secret materials, and (2) producing some evidence that the company used, or is in a position to use, the confidential information without Glyco's authorization. *See IAC*, 160 S.W.3d at 199.

Based on these facts, the Court concludes that Glyco has met its burden to show a substantial likelihood of success on the merits of its trade-secret misappropriation claim. Thus, the first prong of the preliminary-injunction analysis weighs in favor of Glyco.[6]

### b.  Irreparable Injury

---

[6] In its discussion of its likelihood of success on the merits, Plaintiff argues that "attorney's fees should also be granted." Doc. 22-1 at 15. The fee provision cited in support of this request states that the court "*may*" award fees to the "*prevailing party*." *See* Tex. Civ. Prac. & Rem. Code § 134A.005 (emphasis added) ("The court may award reasonable attorney's fees to the prevailing party if . . ."). Because the Court's grant of a preliminary injunction merely preserves the status quo until consideration on the merits, *see, e.g.*, *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (internal citations omitted), Plaintiff's request for fees at the preliminary-injunction stage is premature. *C.f. Rhino Membranes & Coatings Inc. v. Rhino Seamless Membrane Sys., Inc.*, No. 4:06-CV-2112, 2008 WL 4425583, at *20 (S.D. Tex. Sept. 30, 2008) (determining, after bench trial, that in accordance with Tex. Civ. Prac. & Rem. Code §§ 134.001–.005, plaintiff was entitled to damages, injunctive relief, and an award of its reasonable and necessary attorney's fees because defendants unlawfully appropriated Plaintiff's property by stealing trade secrets).

The damages occasioned by a case involving breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law. *See Traders Intern., Ltd. v. Scheuermann*, No. CIV.A. H-06-1632, 2006 WL 2521336, at \*9 (S.D. Tex. Aug. 30, 2006) (quoting *American Express Fin. Advisors, Inc. v. Scott,* 955 F. Supp. 688, 693 (N.D. Tex.1996) ("In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury")). Thus, "[w]hen a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed." *IAC,* 160 S.W. at 200 (internal citations omitted). Accordingly, courts have stated that the threatened disclosure of trade secrets constitutes irreparable injury as a matter of law. *Williams v. Compressor Eng'g Corp.,* 704 S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986), writ ref'd n.r.e. (July 16, 1986) (citing *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 503 (5th Cir. 1982)).

Defendant cites *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) and *Snelling & Snelling, Inc. v. Ryvis, Inc.*, No. 3:99-CV-2028-D, 1999 WL 1032799, at \*2 (N.D. Tex. Nov. 10, 1999) for the propositions that (a) demonstrating irreparable harm is a heavy burden to overcome, (b) speculative injury is insufficient to show irreparable harm, and (c) irreparable harm exists only when there is no adequate remedy at law, such as money damages, or when "a meaningful decision on the merits would be impossible without an injunction." Doc. 28 at 8. First, the Court notes that Defendant cherry picks quotes from these cases. Read holistically, they do not dictate a different result on this element of the analysis. In *Janvey*, for example, the court did indeed say that "harm is irreparable where there is no adequate remedy at law, such as money damages." 647 F.3d at 600. However, in the very next sentence the court goes on to state that "the mere fact that economic damages may be available does not always mean that a remedy at

law is 'adequate.'" *Id.* Accordingly, whether money damages are available is not dispositive to the irreparable-harm analysis. Moreover, Defendant's argument that Plaintiff's loss of trade-secret information to an actual or potential competitor and the resulting loss of business opportunities does not amount to irreparable harm is unpersuasive. *See Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 2:06-CV-381-JRG, 2014 WL 8708239, at *10 (E.D. Tex. Mar. 31, 2014) ("The Court is not convinced that money damages alone would adequately compensate Golden Hour for its loss of the right to exclude and the resulting loss of business opportunities.").

Importantly, in both cases, whether the movant produced evidence to support its irreparable-harm argument was determinative. In *Snelling*, the court concluded the movant failed to carry its burden on the irreparable harm element because it did not introduce evidence to "establish that it is currently losing customers that it would otherwise have served, or employees that it would otherwise have employed, that its goodwill and reputation are being damaged, or that defendants are using confidential information to Snelling's detriment." 1999 WL 1032799, at *2 n.4, 5. In *Janvey*, the court of appeals likewise examined the evidence, concluding that it was sufficient to support the district court's finding on irreparable harm: "Here, the Receiver provided evidence of a massive Ponzi scheme and proof that each individual received proceeds from the fraudulent scheme. This is sufficient to prove the likelihood of each individual removing or dissipating the frozen assets but for the preliminary injunction." 647 F.3d at 601.

Contrary to Defendant's assertions, the Court finds that Plaintiff has met its burden on this element. Plaintiff introduced evidence that Defendant is in possession of Plaintiff's trade secrets and is in a position to use this information—if it has not done so already—and that such use will severely cripple Plaintiff's business model. *See* Docs. 22-2 at 1; 22-7 at 3, 22-4. This is sufficient to demonstrate threat of irreparable harm—even under *Janey* and *Snelling*.

### c. Balance of Harms

The Court finds that this prong also weighs in Glyco's favor. Woodfield's use of Glyco's trade-secret and proprietary information was allowed only under the terms of the MSA—to manufacture product for Glyco. Woodfield has no further right to possession or use of the trade-secret materials. Moreover, because Woodfield is a manufacturer and its affiliate is a distributor, the two companies have the combined capability to produce and distribute a similar product for Woodfield—or on behalf of another company. Accordingly, "the threatened injury of [Glyco's] trade secrets falling into the hands of a competitor outweighs the threatened harm to [Woodfield]." *See Indus. Insulation Group, LLC v. Sproule*, 613 F. Supp. 2d 844, 858 (S.D. Tex. 2009).

### d. Public Interest

Finally, the Court also concludes that granting the preliminary injunction will not disserve the public interest. Glyco provides a consumer product useful in treating wounds and disease. The public interest is benefited by an injunction that will allow Glyco to remain in business and keep this product on the market and available to consumers. Furthermore, granting the injunction in this case will benefit the "public interest in commercial integrity and protection of legal and property rights." *See Core Labs. LP v. Spectrum Tracer Services, L.L.C.*, 532 Fed. Appx. 904, 910–11 (Fed. Cir. 2013) (applying Texas law) (citing *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ)).

### e. Bond

In its final argument, Plaintiff requests that the Court waive the bond requirement of Federal Rule of Civil Procedure 65(c) or, alternatively, require the posting of only a nominal bond of $500. Doc. 22-1 at 15–16. Defendant has not responded to Plaintiff's request. *See* Doc.

28.

Under the Federal Rules, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Notwithstanding the mandatory language of Rule 65(c), the Fifth Circuit has held that a court, in the proper exercise of its discretion, "may elect to require no security at all" in an appropriate case. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)). However, this Court has recently noted that the Fifth Circuit has issued contradictory opinions about whether security in the form of a bond must be posted for a claimant to subsequently recover in an action for wrongful injunction. *Jonibach Mgmt. Trust v. Wartburg Enterprises, Inc.*, No. CIV.A. H-10-600, 2015 WL 5734420, at *24 n.12 (S.D. Tex. Sept. 30, 2015).

In spite of the apparent uncertainty as to the effect of not requiring bond in a later action for wrongful injunction, this Court is persuaded that a bond is unnecessary in this case for three reasons. First, Defendant bears no risk of loss that should be protected against with a bond requirement. *See Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015), judgment entered, No. CIV. 14-03146, 2015 WL 1119980 (S.D. Tex. Feb. 2, 2015) ("Because there is no risk of monetary loss to Defendant as a result of this preliminary injunction, . . . Plaintiff's [bond waiver] request is granted."). Unlike cases in which both parties are relying on contested technology or trade secrets in order to make money, *see Mobius*, 2013 WL 6498981, at *15 (requiring substantial bond in granting preliminary injunction because defendant corporation was already selling a machine allegedly employing plaintiff's source code), Defendant admits that it "has not used, and does not plan to use, Glyco's materials." Doc. 28 at 9. Presumably

Defendant will not suffer any monetary loss as a result of the injunction if it is not using the contested materials. Second, the MSA expressly waives the bond requirement if the parties seek injunctive relief, and Defendant does not challenge the validity of this provision. *See Amerispec, Inc. v. Metro Inspection Services, Inc.*, No. CIV.A.3:01-CV-0946-D, 2001 WL 770999, at *7 (N.D. Tex. July 3, 2001) (enforcing provision in parties franchise agreement waiving the requirement of bond as security when seeking injunctive relief).[7] Finally, Defendant does not oppose Plaintiff's request for a waiver of bond in its briefing. *See Gordon*, 79 F. Supp. 3d at 695 ("[B]ecause Defendant has not responded to Plaintiff's request that the bond be waived, Plaintiff's request is granted."). Accordingly, the preliminary injunction that the court enters today does not require that Glyco post a bond or other security.

### IV. CONCLUSION

For the foregoing reasons it is hereby

**ORDERED** that Plaintiff's Corrected Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction, (Doc. 22) is **GRANTED in PART** and **DENIED in PART**:

- Plaintiff's Motion to Compel Return of Trade Secret Materials and for a Seizure Order (Doc. 22) is **GRANTED**.

- Plaintiff's Motion for a Preliminary Injunction (Doc. 22) is **GRANTED.**

- Plaintiff's Motion for a Temporary Restraining Order (Doc. 22) is **DENIED** as **MOOT**.

Accordingly, it is

**ORDERED** that Defendant, Woodfield Pharmaceutical, LLC and its agents, servants,

---

[7] The MSA states: "The Parties waive the requirement of any bond being posted as security. . . ." Doc. 22-3 at ¶ 6.6.

employees, and those persons in active concert or participation with Woodfield who receive actual notice of the order by personal service or otherwise, are hereby enjoined, pending a final determination on the merits, from in any way manufacturing, marketing, distributing, selling, and/or otherwise disseminating or making available the IPM Wound Gel, IPM Wound Gel Bio and Hylase. It is further

**ORDERED** that Defendant deliver to the Court the following trade-secret materials within its possession:

1. All information relating to Glyco's IPM Wound Gel/IPM Wound Gel Bio or Hylase (former name of product) manufacturing file including any formulations and manufacturing procedures;

2. All of Glyco's IPM Wound Gel, IPM Wound Gel Bio or Hylase manufacturing information that was received from Glyco, ECR Hi Tech, or from Pernix in Woodfield's purchase of that company, and all business related assets;

3. All of Glyco's information relating to Glyco's Hylase (IPM Wound Gel Bio) regulatory file, including all data that GSL performed on Hylase (IPM Wound Gel Bio) including all stability data;

4. All of the information that Glyco sent to Woodfield (GSL or Pernix) as to the Hylase (IPM Wound Gel or IPM Wound Gel Bio) ingredient specifications;

5. All notes that Woodfield (GSL or Pernix) developed using Glyco's manufacturing or regulatory files;

6. Any documents relating to any FDA applications for product clearance or approval where Glyco data or proprietary manufacturing or regulatory files were used;

7. If any, all documents relating to the testing of any finished product or raw materials received from Glyco, on any fully validated testing methods, or methods developed but not validated, that was derived from either documents received from Glyco, or documents improperly retained by Woodfield (GSL or Pernix);

8. Any document received from any third party that includes any information that is derived from Glyco's manufacturing or regulatory file, or was received improperly by Woodfield; and

9. Information on any third party that was improperly given any of Glyco's proprietary information by Woodfield.

It is further

**ORDERED** that Plaintiff's Original Motion to Compel Return of Trade Secret Materials and for a Seizure Order, a Temporary Restraining Order and a Preliminary Injunction, Doc. 15, is superseded by the current motion and is, therefore, **DENIED** as **MOOT.**

SIGNED at Houston, Texas, this 27th day of April, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE